IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

DARIN RENSINK,

       Plaintiff,

vs.

WELLS DAIRY, INC.,

       Defendant.

No. 09-CV-4035-DEO

MEMORANDUM OPINION AND ORDER
ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

_____

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . 2

II.   FACTS   . . . . . . . . . . . . . . . . . . . . . . 2
      A.   Alleged Disabilities  . . . . . . . . . . . . 2
      B.   Employment With Wells Dairy . . . . . . . . . 3
      C.   Relevant Personnel  . . . . . . . . . . . . . 4
      D.   Defendant's   Disciplinary   Policy;   Plaintiff's
           Disciplinary History  . . . . . . . . . . . . 5
      E.   Events of May 1, 2008 . . . . . . . . . . . . 7
      F.   Events of May 5, 2008 . . . . . . . . . . . . 12
      G.   The Investigation Surrounding the May 5 Incident and
           Plaintiff's Termination . . . . . . . . . . . 14
      H.   Subsequent Complaint and Investigation By The Iowa
           Civil Rights Commission . . . . . . . . . . . 15
      I.   Plaintiff's Alleged Harassment  . . . . . . . 19
      J.   Plaintiff's FMLA Leave  . . . . . . . . . . . 20

III.  LAW AND ANALYSIS  . . . . . . . . . . . . . . . . 22
      A.   Standards for Summary Judgment  . . . . . . . 22
      B.   Exhaustion  . . . . . . . . . . . . . . . . . 25
      C.   Plaintiff's   Termination   Claim   under   McDonnell
           Douglas and the ADA . . . . . . . . . . . . . 40
      D.   Plaintiff's   Harassment/Hostile   Work   Environment
           Claim . . . . . . . . . . . . . . . . . . . . 53
      E.   Plaintiff's claims under the FMLA . . . . . . 59

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . 66

## I. INTRODUCTION

This matter is before the Court on Defendant Wells Dairy, Inc.'s (hereinafter "Defendant" or "Wells Dairy") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Docket No. 16. In support of its motion, Defendant argues that there are no genuine issues of material fact with respect to Plaintiff's claims pursuant to the Americans with Disabilities Act ("ADA"), Family Medical Leave Act ("FMLA"), and Iowa Civil Rights Act ("ICRA"). Thus, Defendant argues it is entitled to summary judgment as a matter of law.

## II. FACTS

The summary judgment record reveals the following facts:

### A. Alleged Disabilities

Plaintiff Darin Rensink (hereinafter "Plaintiff" or "Rensink") suffers from migraine headaches that last 24-48 hours and can be so severe that he must go to the hospital to obtain an injection for relief. Plaintiff's migraine headaches cause him to lose his peripheral vision, have blurred vision, experience numbness in his arms and legs, and

have slurred speech.  Plaintiff also occasionally experiences blackouts associated with his migraines, which require him to rest and sleep in a dark, quiet room.  The migraine headaches happen as often as once a week and as seldom as every other month.

Plaintiff also suffers from an intellectual disability with an IQ level of 66.[1]  As a result, Plaintiff is a slow learner, has delayed motor reaction times, and is irritable in situations with which he is unfamiliar.  Plaintiff is able to perform a job well when he has adequate time to learn the skill; however, he is limited to skills that are available to a person of an IQ level of 66 or less and skills that do not require quickness.

### B.  Employment With Wells Dairy

Plaintiff worked for Defendant from April 2, 1995, until his suspension on May 5, 2008, and ultimate termination on May 22, 2008.  Defendant manufactures, distributes, and sells ice cream and novelty products, such as "Blue Bunny" ice cream, frozen yogurt, sherbet, and frozen novelties.  Plaintiff

---

[1]  According to Plaintiff, his IQ was determined by testing conducted when he was in high school.

worked on the production line at the North Ice Cream Plant in LeMars, Iowa.  Plaintiff commonly worked on "stick" lines, including the 18-wide gram and 16-wide gram lines which produced various frozen novelties on a stick.

C.  **Relevant Personnel**

Plaintiff worked with various personnel who in one way or another are relevant to his discrimination claims in this case.  Korey Behr was Plaintiff's immediate supervisor.  Gregg Junck was the next level superior, and Dick Kennedy was the North Ice Cream Plant's manager.  Quality control employees (who worked in a separate department) included lab technicians whose responsibilities included assuring that Defendant's products met food quality standards.  Aura Lea Butzke was a lab technician at the North Ice Cream Plant.  Her immediate supervisor was Karissa Vaughan.

On a number of occasions, Plaintiff worked on the production line with line operator Mike Finch and coworker Julie Meyer.

At the time of the relevant events in this case, Ronette Powell and Gary Lovell were employees in Defendant's human resources department.  Ms. Powell, along with plant manager

Mr. Kennedy, made the final decision to terminate Plaintiff.

A labor organization – the Employee Committee – represents nonexempt employees at Wells Dairy pursuant to a collective bargaining agreement. Any time an employee is disciplined or desires to make a complaint to management, the employee may request that a representative of the Employee Committee assist him. The Employee Committee representative at the North Ice Cream Plant at the time of Plaintiff's termination was Joel Epling, a production worker for Defendant.

**D. Defendant's Disciplinary Policy; Plaintiff's Disciplinary History**

When a Wells Dairy employee is disciplined, the disciplinary action usually involves the use of a "Discussion Planner" form, which documents and summarizes the relevant facts of the incident, the employee's prior performance, and Wells Dairy's disciplinary action taken as a result of the incident. Since August 2004, Plaintiff was subjected to five documented disciplinary actions while working for Defendant. In August 2004, Plaintiff took an unscheduled restroom break, but was suspended for one day when he instead smoked outside

of the plant.  In June 2005, Plaintiff received a letter of reprimand for eating food off the processing line.

In March 2007, Plaintiff reached under a safety guard to fix a tear in the wrapping paper fed into a machine on his line.  As he reached in, a component of the machine grabbed Plaintiff's glove, tore it, and pulled his hand toward a crimper mechanism.  A bar from the machine subsequently hit his hand, injuring him.  Nobody witnessed this incident, but Plaintiff nevertheless admitted the incident to his superiors.

This March 2007 incident constituted a "serious safety violation" under Defendant's work rules, and as a result Defendant gave Plaintiff a five-day unpaid suspension from work.  Defendant also gave Plaintiff a Discussion Planner which detailed the event and the discipline and informed him that if a safety violation occurred again, he would be subject to termination.

In July 2007, Plaintiff was involved in a verbal altercation with another coworker.  Plaintiff's supervisor, Mr. Behr, entered into the room and, according to Plaintiff, disciplined Plaintiff but not the coworker.  Rensink Dep. 34-35, Pl. App. 3.  In February 2008, Plaintiff was involved in

another verbal altercation with a coworker and was given a five-day unpaid suspension for poor job performance.

### E. Events of May 1, 2008

On May 1, 2008, while working the 18-wide gram line, Plaintiff noticed what looked like grease on the wrapping paper on some of the bars he handled. Plaintiff informed the line operator, Mike Finch, of this problem. Mr. Finch told Plaintiff he was busy and to tell Mr. Junck about the problem. Plaintiff told Mr. Junck who, according to Plaintiff, walked away without doing anything or instructing Plaintiff as to what he should do with the bars.

Later the lab technician, Ms. Butzke, was at the line. Plaintiff told her about the substance on the wrapping paper and that he had reported it to Mr. Junck, who did nothing about it. Ms. Butzke ordered that all of the bars produced at that time, including the bars with the substance, be put "on hold" so they could sort them before packing.

Subsequently, Ms. Butzke had a conversation with Ms. Vaughan, Mr. Behr, and Mr. Junck. Ms. Butzke explained to them what happened and the steps she took regarding the substance on the wrapping paper. Ms. Butzke later recounted

the details of that conversation in writing:

> We were discussing the morning chain of
> events and Darin's comments when [Mr.
> Junck] said[,] "[y]ou need to consider the
> source." Then [Mr. Behr] stated, "You
> don't put something on hold because Darin
> tells you to. You need to consider who it
> is." I explained to them that quality is
> everyone's job. Again, they both told me
> I need to consider the source. [Mr. Behr]
> said something to the effect of[,] ["]Come
> on, it's Darin.["] I told them[,] "I don't
> know why you keep bringing Darin's name
> into this. I don't care what employee it
> is, they have a right to notify the lab of
> an unacceptable product." At that point,
> [Mr. Behr] said, "I don't care what
> employee it is. It could have been Julie
> Meyer. You don't just go and put something
> on hold because an employee tells you to."

Rensink Dep. 49, 54-55, Ex. E; Def. App. 59, 63-64, 229.[2]

Although Plaintiff was not present during this May 1
conversation, Ms. Butzke told him about the conversation after
it was over. At his deposition, Plaintiff testified that he
believed Mr. Behr's comments to Ms. Butzke singled him out in
a negative way. Plaintiff testified as follows:

---

[2] Ms. Butzke provided Plaintiff this written account to
support his administrative complaint to the Iowa Civil Rights
Commission.

A:   Yep.  And Korey stated you don't put
               something on hold because Darin tells
               you to.  You need to consider who it
               is.

          Q:   And that's what Aura Lea [Butzke] told
               you that day?

          A:   Yes.  That's exactly what she told me.

          Q:   And you thought that was wrong?

          A:   Yes.

          Q:   Why did you think that was wrong for
               him to say that about you?

          A:   Because  of  my  disabilities  maybe.
               Just because it's me.

          Q:   When  you  say  because  of  your
               disabilities maybe, what do you mean
               by that?

          A:   Well, there is times where I am slow
               at some of the machines.  Sometimes I
               don't react fast enough, but yet I do
               know how to do the job.

          Q:   And that's why you thought what Mr.
               Behr said was bad?

          A:   Yep.  Yes.

Rensink Dep. 56-57; Def. App. 65-66.

     After Ms. Butzke informed Plaintiff of this conversation,

Plaintiff notified Mr. Epling.  Mr. Epling talked with Ms.

Butzke, where he reported she "interpreted [the comment] very

                              9

negatively... [she was] rather upset about that kind of response from a supervisor..." Epling Dep. 25; Pl. App. 21. Mr. Epling recalled telling Ms. Millikan what Plaintiff and Ms. Butzke told him – that Plaintiff believed Mr. Behr and Mr. Junck harassed and scrutinized him, that Mr. Behr said something to Ms. Butzke about "consider the source" in a derogatory tone, and that Mr. Behr's actions were inappropriate for a supervisor. Epling Dep. 22-28; Def. App. 199-205.

Plaintiff and Mr. Epling met with Ms. Powell in the human resources department to complain about this conversation. In his deposition, Plaintiff described what he told Ms. Powell about Mr. Behr's comments to Ms. Butzke:

> A:   ... When we walked into Ronette Powell's office, Ronette asked me what was wrong, and I told her. I says, we had problems with the bars this morning, and we put the first hour on hold, and Aura Butzke went up to Korey Behr's office, and I said [to Ms. Powell], Korey Behr made a comment to [Aura Butzke] that just because it's me, you don't have to put this stuff on hold, and you can look in the eyes of Mr. Rensink and you can find out what's in his eyes.
>
> * * *

Q:    What else did you tell Ronette Powell?

        A:    I said, I think something should be
              done about that.  A supervisor don't
              need to say stuff about me like that.

        *  *  *

        A:    Oh, yes.  I also mentioned to her that
              day, and I says [to Ms. Powell], Korey
              Behr has people watching me and has
              told people that he's trying to get
              rid of me for some reason.  I have no
              idea.

        Q:    That's what you told her?

        A:    Yep.

        Q:    Did you tell her anything else about
              what Mr. Behr had said or done to you
              in the past?

        A:    No.

Rensink Dep. 51-53; Def. App. 60-62.

    In this meeting, neither Plaintiff nor Mr. Epling
mentioned other conduct by Mr. Behr.  Furthermore, neither of
them stated that Mr. Behr's treatment toward Plaintiff was due
to his disabilities.  Plaintiff argues, however, that this
meeting put Ms. Powell on notice about Mr. Behr's behavior and
that it was a continuing pattern of behavior.

    Ms. Powell testified that she then spoke with Ms. Butzke.
She testified that Ms. Butzke did not think the comments were

appropriate for a supervisor.  Powell Dep. 38; Pl. App. 15.

**F.  Events of May 5, 2008**

On May 5, 2008, Plaintiff monitored the area where wrapping paper fed into the wrapper feed and crimper machine. Mr. Junck was directly across from and facing Plaintiff, and Julie Meyer was beside Plaintiff.  The workers experienced problems with the wrapper in the crimper, and at one point, Plaintiff reached with his hand to grab a piece of wrapper. The parties dispute whether the machine was still running at the time Plaintiff grabbed the wrapper, whether Plaintiff placed his hand underneath the safety guard, and whether this conduct constituted a safety violation.  Ms. Meyer believed Plaintiff reached his hand in where it should not have been. Ms. Meyer yelled at Plaintiff, hit his hand with a stick she was holding and stated, "get your hand out of the machine." Plaintiff responded that he did not have his hand underneath the safety guard because if he had, he would have been seriously hurt.

Some time later, Mr. Junck asked Plaintiff why he had his hand under the safety guard, and Plaintiff denied that he did. According to Plaintiff, Mr. Junck was in a position to see

whether or not Plaintiff had his hand underneath the safety guard (Plaintiff maintains he did not), but instead relied on what Ms. Meyer had said happened. Plaintiff further pointed out that Mr. Junck did not comment on the alleged event when it occurred, but instead waited until much later.

Mr. Junck reported the incident to Mr. Lovell, and soon after Plaintiff met with Mr. Lovell, Mr. Junck, Mr. Behr, and Mr. Epling, the Employee Committee representative who came to the meeting to represent Plaintiff. The parties dispute the contents of the discussion held at this meeting, specifically with respect to whether Plaintiff admitted he placed his hand underneath the guard or whether he admitted to committing a serious safety violation. The parties also dispute whether the machine was running at the time of the incident.[3] At the conclusion of the meeting, Mr. Lovell placed Plaintiff on suspension pending an investigation of the incident.

---

[3] At his deposition, Plaintiff testified that, at the May 5 meeting, he denied admitting that his hand was underneath the safety guard. Rensink Dep. 73; Pl. App. 8. Thus, for purposes of this summary judgment motion only, the Court will assume Plaintiff's statement was true.

**G.   The Investigation Surrounding the May 5 Incident and Plaintiff's Termination**

At the conclusion of Mr. Lovell's review, he prepared a written report and concluded that Plaintiff committed a serious safety violation. Epling Dep. 42-43; Ex. 8; Def. App. 216-17, 257.  The report also noted that Plaintiff's record included the prior serious safety violation from March 2007.

After receiving Mr. Lovell's report, Ms. Powell conducted her own independent investigation of the incident.  Ms. Powell testified that during this investigation, she went to the line where Plaintiff worked on the day of the May 5 incident and interviewed Mr. Junck as to his version of the incident. Powell Dep. 44-45; Def. App. 133-34.   Ms. Powell also interviewed Noreen Thoms, the plant safety manager.   Ms. Powell also communicated with Mr. Epling, and she was aware that Mr. Epling opined that Plaintiff could not have placed his hand underneath the machine without injuring himself. Powell Dep. 46; Pl. App. 17.  When asked whether she received a recommendation from Mr. Junck as to whether or not Plaintiff should be terminated, Ms. Powell stated, "... because [Mr. Junck] was the prior Director of Safety ... he's got safety

expertise and he would know[,] you know[,] any safety violation lockout/tagout violation, so definitely his input was valued." Powell Dep. 62; Pl. App. 18. Ms. Powell also stated that she did not receive a recommendation from Mr. Behr as to whether Plaintiff should be terminated; however, Plaintiff argues she reviewed the Discussion Planners used in Defendant's Progressive Discipline Plan, which Mr. Behr previously filed. Ms. Powell further testified that she relied on the findings in Mr. Lovell's report, her own conclusions of what happened on May 5, and Plaintiff's prior five-day suspension for a serious safety violation in March 2007. Powell Dep. 63-64; Pl. App. 18.

On May 22, 2008, Ms. Powell met with Mr. Kennedy, the plant manager, to discuss the matter and together they called Plaintiff and terminated his employment for committing an alleged safety violation.

**H.    Subsequent Complaint and Investigation By The Iowa Civil Rights Commission**

On May 23, 2008, Plaintiff filed his administrative complaint with the Iowa Civil Rights Commission (the "ICRC").

Am. Comp. ¶ 5, Comp. Ex. A; Def. App. 2, 15-19.  The ICRC complaint reveals the following relevant entries:

At No. 5, in completion to the statement that "I was discriminated against because of my ..."  Plaintiff checked the box for "Disability."  Plaintiff did not check the box for "Retaliation."  Am. Comp. ¶ 5, Comp. Ex. A; Def. App. 2, 15.

At No. 7, asking him to identify the discriminatory action taken against him, Plaintiff checked the box for "Harassment."  Plaintiff did not check the boxes for "Denied Accommodation/Modification," "Disciplined/Suspended," or "Terminated."  Am. Comp. ¶ 5, Comp. Ex. A; Def. App. 2, 16.

At No. 14, asking him who had harassed him, Plaintiff identified Mr. Behr.  Am. Comp. ¶ 5, Comp. Ex. A; Def. App. 2, 17.

At No. 15, asking him the date of the most recent discriminatory incident, Plaintiff stated May 1, 2008.  Am. Comp. ¶ 5, Comp. Ex. A; Def. App. 2, 17.

At No. 16, asking him if he was still employed and, if not, when and how the employment ended, Plaintiff responded "No" and indicated that his employment ended by termination on May 5, 2008.  Am. Comp. ¶ 5, Comp. Ex. A; Def. App. 2, 17.

At No. 17, Plaintiff stated the following basis for his discrimination claim:

> We started the Line up and I noticed there was grease on the paper and I told the lab. person to put the first 45 min to... 1 hour... on hold so she went to supervisor and told him (Korey B[e]hr) then he got mad and he said don't listen to him because look at the sources and he also said that I Darin Rensink was stupid.[4]

Am. Comp. ¶ 5, Comp. Ex. A; Def. App. 2, 18.

On June 27, 2008, Plaintiff's then counsel, Mr. Erickson, sent a letter to the ICRC and requested to amend his administrative complaint "to include a claim for retaliation." Am. Comp. ¶ 5, Comp. Ex. B; Def. App. 2, 12.

Plaintiff and Defendant subsequently completed separate ICRC questionnaires on Plaintiff's background, termination, disability, and harassment. Pl. App. 29-34, 35-49. The termination response questionnaire included questions such as reasons that Plaintiff was terminated and the individual(s) responsible for the decision to terminate along with a description of Plaintiff's job. The disability response questionnaire included questions about Defendant's knowledge

---

[4] The parties do not dispute that this statement was in reference to the May 1 incident.

of Plaintiff's disability, Plaintiff's requests for accommodation, and previous accommodation requests by other employees. The harassment response questionnaire asked whether Plaintiff filed or made an internal complaint or grievance concerning harassment (Defendant admits that Plaintiff did complain about harassment), what Defendant's response was to the complaint, and Defendant's anti-harassment policies.

After an investigation, the ICRC filed a "Screening Data Analysis and Case Determination" (the "ICRC Determination"), dated August 11, 2008. Pl. App. 115-18. The ICRC Determination lists Plaintiff's allegations as harassment due to a mental disability, citing the May 1 incident, and termination because of his mental disability. ICRC Determination at 1; Pl. App. 115. After an analysis of the May 1 incident, Plaintiff's disciplinary history, the May 5 incident and circumstances surrounding Plaintiff's termination, the ICRC concluded there was no evidence that Defendant's or Mr. Behr's actions were because of Plaintiff's disability.

## I.  Plaintiff's Alleged Harassment

Plaintiff alleges he was subjected to a continuing pattern and practice of unlawful harassment.  For example, Plaintiff cites to Ms. Butzke's May 1 conversation with Ms. Vaughan, Mr. Behr, and Mr. Junck, as set out on pages 7-8 of this order.  At one time, Plaintiff overheard Mr. Behr tell Ms. Meyer to watch everything Plaintiff did wrong so Plaintiff would get fired.  Mr. Behr did not say why he wanted Plaintiff fired, and Plaintiff told Ms. Powell he had "no idea" of the reason why.  According to Plaintiff, Mr. Finch told him that Mr. Behr wanted Plaintiff watched so he would have grounds to fire him if he did anything wrong.  Because of this statement, Plaintiff testified that he became nervous at times, but that it did not affect his ability to do his job when he was not watched.  Plaintiff alleges, however, that his job performance was affected while he was watched.  Pl. Resp. to Def. Statement of Facts, ¶ 90.

According to Plaintiff, Mr. Behr told Mr. Finch that Plaintiff was stupid.  Rensink Dep. 118; Def. App. 115. Additionally, Mr. Finch stated that Mr. Behr once referred to Plaintiff as a "retard."  Finch Aff. ¶ 3; Pl. App. 24.

Plaintiff further alleges that Mr. Behr harassed him because Mr. Behr forced him to work on certain lines that were too fast for his capabilities, even after Plaintiff requested not to do so. Rensink Dep. 94, 104-06; Pl. App. 10-12.

**J.  Plaintiff's FMLA Leave**

From time-to-time, Plaintiff requested leave under the FMLA due to his migraine headaches. Plaintiff's migraine headaches were such that he required intermittent leave because his condition was ongoing and would render him incapable of performing his job at times. Accordingly, Plaintiff provided Defendant with medical certifications under the FMLA so that he could take leave as needed. Plaintiff had requested and been pre-approved for FMLA leave on an intermittent basis in August 2007. Rensink Dep. 85; Powell Dep. 58-59, Ex. J; Def. App. 89, 139-40, 236.

Defendant never denied Plaintiff requested FMLA leave, with one exception in 2007. At the time, Defendant's attendance policy allowed an employee to have up to eight unexcused absences. Each unexcused absence was an "occurrence," and the ninth occurrence was grounds for termination. On November 30, 2007, Plaintiff called Defendant

before the start of his shift and stated that he was suffering from a migraine headache and would not be able to work that day. He did not say that the absence should count as FMLA leave. When Plaintiff came to work the next work day, he learned that his absence was counted as unexcused, which made it his sixth "occurrence." Plaintiff complained to Mr. Behr and Ms. Powell, both of whom refused to excuse his absence as FMLA leave. Although Plaintiff was documented for his sixth of eight allowed "occurrences," Plaintiff was not terminated for the absence. Plaintiff alleges, however, that an "occurrence" was a form of discipline according to Defendant's employee handbook. See Pl. App. 50-114.

According to Plaintiff, this is the only instance when he requested FMLA leave but the absence was counted as unexcused. Rensink Dep. 76, 89; Def. App. 84, 93. Prior to his termination, Plaintiff had recently used FMLA leave from April 21-23, 2008. Defendant never refused to reinstate Plaintiff to his position and employment status following his return from FMLA leave. Rensink Dep. 102; Def. App. 103.

Plaintiff attributes Mr. Behr's conduct — his harassment, his reason for directing others to keep an eye on Plaintiff,

and his reason for wanting to see Plaintiff terminated — in part, to Plaintiff's use of FMLA leave based on the November 30, 2007, unexcused absence. Rensink Dep. 97-100, 113-14; Def. App. 99-102, 110-11.

Plaintiff does not have any evidence that Mr. Lovell's investigation and conclusions relating to Plaintiff's termination was based on his use of FMLA leave. Rensink Dep. 97-100, 112-14; Def. App. 99-102, 109-11. Likewise, Plaintiff does not have any evidence that Ms. Powell's actions relating to his termination - her investigation, her conclusion, and her decision - were based on Plaintiff's use of FMLA leave, and Ms. Powell testified that her actions relating to his termination were not based on his use of FMLA leave. Powell Dep. 65; Def. App. 146. Plaintiff alleges, however, that Ms. Powell relied on information gained from Mr. Behr and Mr. Junck to make her decision to terminate Plaintiff.

III.     LAW AND ANALYSIS

A.     Standards for Summary Judgment

The standard for granting summary judgment is well established. A motion for summary judgment may be granted only if, after examining all of the evidence in the light most

favorable to the nonmoving party, the Court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Montgomery v. John Deere & Co.</u>, 169 F.3d 556, 559 (8th Cir. 1999). A fact is material if it might affect the outcome of the suit under the governing substantive law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). An issue of material fact is genuine "if it has a real basis in the record." <u>Hartnagel v. Norman</u>, 953 F.2d 394, 395 (8th Cir. 1992) (citing <u>Matsushita</u>, 475 U.S. at 586-87).

The party moving for summary judgment bears the "initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of genuine issue." <u>Celotex</u>, 477 U.S. at 323. Once the moving party has carried its burden, the opponent must go beyond the pleadings and designate specific facts – by such methods as affidavits, depositions, answers to interrogatories, and admissions on file – that show there is a genuine issue for trial. <u>See</u> Fed. R. Civ. P. 56(e);

23

_Celotex_, 477 U.S. at 324. The evidence of the nonmoving party is to be considered as true, and justifiable inferences arising from the evidence are to be drawn in his or her favor. _Anderson_, 477 U.S. at 255. If the evidence of the nonmoving party is "merely colorable," or is "not significantly probative," summary judgment may be granted. _Id._ at 249-50. Thus, although the nonmoving party does not have to provide direct proof that genuine issues of fact exist for trial, the facts and circumstances on which the nonmoving party relies must "attain the dignity of substantial evidence and must not be such as merely to create a suspicion." _Metge v. Baehler_, 762 F.2d 621, 625 (8th Cir. 1985). In essence, the evidence must be "such that a reasonable jury could find a verdict for the nonmoving party." _Anderson_, 477 U.S. at 248.

As employment actions are inherently fact based, the Eighth Circuit has repeatedly cautioned that summary judgment should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." _Hindman v. Transkrit Corp._, 145 F.3d 986, 990 (8th Cir. 1998) (citations omitted). _See also_ _Crawford v. Runyon_, 37 F.3d 1338, 1341

(8th Cir. 1994) (citing <u>Johnson v. Minn. Historical Soc'y</u>, 931 F.2d 1239, 1244 (8th Cir. 1991)) ("summary judgment should seldom be used in employment-discrimination cases"); <u>Hillebrand v. M-Tron Indus., Inc.</u>, 827 F.2d 363, 364 (8th Cir. 1987).  This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination."  <u>Breeding v. Arthur J. Gallagher & Co.</u>, 164 F.3d 1151, 1156 (8th Cir. 1999) (quoting <u>Lynn v. Deaconess Med. Ctr.-W. Campus</u>, 160 F.3d 484, 486–87 (8th Cir.1998)).

Nevertheless, the plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322; <u>see also</u> <u>Snow v. Ridgeview Med. Ctr.</u>, 128 F.3d 1201, 1205 (8th Cir. 1997) (citing <u>Bialas v. Greyhound Lines, Inc.</u>, 59 F.3d 759, 762 (8th Cir. 1995)).

**B.  Exhaustion**

As mentioned, Plaintiff is suing Defendant pursuant to

the ADA, ICRA, and FMLA.  The ADA and ICRA require Plaintiff
to exhaust his administrative remedies prior to filing suit in
this Court.  This is accomplished by timely filing a charge of
discrimination with the Iowa Civil Rights Commission and Equal
Employment Opportunity Commission, and subsequently receiving
from each commission a right-to-sue letter.  <u>See</u> <u>Baker v. John</u>
<u>Morrell & Co.</u>, 220 F. Supp. 2d 1000, 1009-10 (N.D. Iowa 2002).

Defendant concedes that Plaintiff exhausted his
administrative remedies as to his harassment/hostile work
environment claim, but argues that Plaintiff failed to exhaust
his administrative remedies as to his failure to accommodate
and discriminatory and retaliatory termination claims.
Defendant reasons, in part, that Plaintiff's administrative
complaint states only that he was harassed.  Thus, Defendant
argues that Plaintiff's harassment and FMLA claims are the
only claims that should remain for the Court's consideration.
Plaintiff, on the other hand, argues that while his initial
administrative complaint alleges that Defendant discriminated
against and harassed Plaintiff because of his disability,
Plaintiff's counsel subsequently submitted a letter to the
ICRC requesting to amend his complaint to include a claim for

retaliation. Additionally, Plaintiff argues that the questionnaires sent to Plaintiff and Defendant are sufficient to put Defendant on notice of Plaintiff's claims, and show that the ICRC investigated all claims. Thus, Plaintiff argues he exhausted his administrative remedies as to all claims.

Plaintiff's administrative remedies are exhausted "as to all incidents of discrimination that are like or reasonably related to the allegations of the administrative charge." Soto v. John Morrell & Co., 285 F. Supp. 2d 1146, 1170 (N.D. Iowa 2003) (quoting Hargens v. U.S. Dep't of Agric., 865 F. Supp. 1314, 1327 (N.D. Iowa 1994)). As is the case here, persons filing administrative charges typically lack legal training, so the Court must construe Plaintiff's discrimination claims charitably and with the "utmost liberality." Duncan v. Delta Consol. Indus., Inc., 371 F.3d 1020, 1025 (8th Cir. 2004); Bainbridge v. Loffredo Gardens, Inc., No. 4:02-CV-40192, 2003 WL 21911063, at *4 (S.D. Iowa July 31, 2003). Thus, the judicial complaint need not mirror the administrative complaint, but the sweep of the judicial complaint may only be "as broad as the scope of the [administrative] investigation which could reasonably be

expected to grow out of the charge of discrimination." Duncan, 371 F.3d at 1025. Nevertheless, "there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo*, a claim which simply was not made." Id. (internal quotations omitted).

As mentioned, Defendant does not dispute that Plaintiff exhausted his administrative remedies as to his harassment/hostile work environment claim. Thus, the Court will further review whether this claim can survive summary judgment below. The remaining question, therefore, is whether Plaintiff exhausted his administrative remedies as to his remaining discrimination claims in his amended complaint.

The contents of Plaintiff's administrative complaint are set out in detail on pages 15-18 of this order. As noted, in Plaintiff's ICRC complaint, he does not explicitly allege (1) that Defendant terminated him because of his disability, (2) that Defendant failed to accommodate him, or (3) that Defendant terminated him in retaliation for his May 1 complaint against Korey Behr, which he filed with Ms. Powell. While the administrative complaint states that Defendant terminated him on May 5, 2008 (Def. App. 17), Plaintiff fails

to check the "terminated" box in the section that asks him to check the action the organization took against him (Def. App. 16). Plaintiff also fails to check the "retaliation" or "denied accommodation/modification" boxes. In the factual summary of allegations, Plaintiff does not mention his complaint filed with Ms. Powell, the May 5 incident, or his termination. Def. App. 18. Plaintiff nevertheless argues that he exhausted the retaliation, termination, and failure to accommodate claims because, according to Plaintiff, the ICRC investigated these claims as evidenced by the questionnaires sent to both parties as well as the ICRC Determination. Defendant, however, argues that Plaintiff must plead his claims in the administrative complaint and factual summary, and that the court's holding in Bainbridge, 2003 WL 21911063, at *4 (aff'd Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756 (8th Cir. 2004)), supports this argument and "cannot be distinguished in any meaningful way from [Plaintiff's] case." Def. Br. 12. Both parties' arguments are, in some respects, misguided.

Regarding Defendant's argument, Plaintiff need not explicitly allege his discrimination charges in the

administrative complaint so long as subsequent charges brought in this Court are reasonably related to or are within the scope of an investigation that could reasonably grow out of the administrative charge. <u>Duncan</u>, 371 F.3d at 1025. Thus, it is not necessarily fatal to Plaintiff's claim that he did not check the appropriate boxes or explicitly allege each and every charge of discrimination in his administrative complaint.

As mentioned, Defendant also argues that the district court's decision in <u>Bainbridge</u> cannot be distinguished in any meaningful way from Plaintiff's case, and that this Court should therefore dismiss Plaintiff's claims (excluding harassment) on the basis that he did not exhaust his administrative remedies. This Court has carefully reviewed the <u>Bainbridge</u> decision.

In <u>Bainbridge</u>, the plaintiff charged in the judicial complaint that the defendant terminated him because of race or association with race, retaliation, and hostile work environment. The defendant moved for summary judgment, in part, on the basis that the plaintiff did not exhaust his administrative remedies as to his retaliation claim. The

plaintiff asserted that he raised retaliation in the administrative complaint,[5] that the ICRC investigated the claim as evidenced by the subsequent ICRC questionnaires, and that the defendant was therefore on notice that retaliation was an issue.

The district court in Bainbridge ultimately concluded that the plaintiff did not exhaust his administrative remedies as to retaliation. The court reasoned that the plaintiff did not check the "retaliation" box on the administrative complaint and did not allege any facts which connected his termination from employment with his complaint about the derogatory comments. The court further reasoned that, although the defendant received a questionnaire which included questions relating to retaliation, and although defense counsel wrote a letter to the ICRC stating the defendant had

_____

[5] In Bainbridge, the factual allegations in the administrative complaint alleged that the plaintiff's coworkers made derogatory comments about Japanese persons. The plaintiff's wife was of Japanese descent. The plaintiff stated that he complained to the operation manager about the derogatory comments, subsequently went on vacation, and was terminated upon his return. He then stated, "[o]ther reasons were given. This type of discriminating remarks were given ... have heard, made for a intimidating, hostile, and offensive working environment for me. Plus upsetting my wife and children." Bainbridge, 2003 WL 21911063, at *4.

a defense should the plaintiff allege retaliation, there was no evidence the defendant had notice that the plaintiff charged retaliation.  The court also recognized that the ICRC investigator did not investigate retaliation.   The Eighth Circuit affirmed the district court's decision, stating:

> Bainbridge did not check the box next to "retaliation" on the [administrative] complaint form and did not allege any facts in the complaint form connecting his termination with his alleged complaint about the racial slurs.  Indeed, the Iowa civil rights complaint investigator noted he "didn't address [retaliation] because [Bainbridge] did not directly allege retaliation."

Bainbridge, 378 F.3d at 760.  The Bainbridge decisions further demonstrate that a questionnaire that addressed a given claim did not necessarily mean that the plaintiff exhausted his administrative remedies as to that claim, especially when the administrative agency did not actually investigate the claim.

The district and appellate courts in Bainbridge found relevant that the ICRC did not actually investigate the plaintiff's retaliation claim.  Other courts within the Eighth Circuit have similarly found that the lack of actually investigating a claim was relevant as to whether the plaintiff exhausted his administrative remedies.  Williams v. Little

Rock Mun. Water Works, 21 F.3d 218, 223 (8th Cir. 1994)
(recognizing that there was no actual investigation of the
respective administrative claims); see also Ross v. City of
Independence, 76 F. App'x 108, *1 (8th Cir. 2003) (concluding
the plaintiff failed to exhaust her administrative remedies,
in part, because she presented no evidence that the
administrative agency actually investigated or attempted to
conciliate the charge of discrimination with a discrete and
separate event); Price v. Harrah's Md. Heights Operating Co.,
117 F. Supp. 2d 919, 922 (E.D. Mo. 2000) (concluding Plaintiff
did not exhaust her administrative remedies, in part, because
the EEOC's findings in its determination did not show that it
investigated the charged claim).

Along these lines, Plaintiff in this case argues that he
exhausted his administrative remedies as to all applicable
claims in the judicial complaint because the ICRC actually
investigated the claims, as evidenced by the questionnaires
sent to the parties as well as the findings outlined in the
ICRC Determination. Plaintiff further argues that the letter
submitted to the ICRC by his then counsel, Mr. Erickson, which
requested an amendment for retaliation was sufficient in this

case.  The Court is persuaded Plaintiff's arguments miss the point for several reasons.

First, the applicable standard for this Court's review is not the scope of the ICRC's actual investigation, but what the Court reasonably would expect the ICRC to investigate based on Plaintiff's administrative complaint.  The Court, however, is mindful that "the investigation of a particular claim creates a strong inference that such a claim was presented." Hargens, 865 F. Supp. at 1326 (citing Clark v. Kraft Foods, Inc., 18 F.3d 1278, 1280 (5th Cir. 1994)).  Thus, while the ICRC's investigation of Plaintiff's claims in this case creates a strong inference that Plaintiff exhausted his administrative remedies, the Court can rely on the actual investigation only to the extent that an investigation was a reasonably expected result of Plaintiff's administrative complaint.

The Court, however, disagrees that the ICRC actually investigated each of Plaintiff's claims raised in the amended complaint in this case.  The ICRC Determination in this case quite plainly outlines in the first two paragraphs the scope of Plaintiff's claims and the ICRC's investigation.  These

paragraphs state that "[c]omplainant alleges harassment due to a mental disability" and that "[c]omplainant alleges he was terminated because of his mental disability." Pl. App. 115. The ICRC Determination makes no mention of Plaintiff's claims for retaliation or failure to accommodate.

As to retaliation, the ICRC Determination makes no mention that Plaintiff alleged retaliation and in no way connects Plaintiff's May 1 grievance filed with Ms. Powell with the May 5 incident or Plaintiff's subsequent termination. Generally, "retaliation claims are not reasonably related to underlying discrimination claims." <u>Duncan</u>, 371 F.3d at 1025. Also, Plaintiff's administrative complaint does not cite to any protected conduct on May 1. The administrative complaint states only that his immediate supervisor, Korey Behr, harassed him.

Moreover, there is no evidence that the ICRC accepted Mr. Erickson's letter as an amendment to Plaintiff's administrative complaint, or that the letter was ever forwarded to Defendant to place Defendant on notice of Plaintiff's retaliation claim. Indeed, the ICRC never sent any retaliation questionnaire to either party, and as

mentioned, the ICRC Determination makes no mention of this letter even though it expressly lists the harassment and disability termination claims in the first two paragraphs. While the termination questionnaire mentions Plaintiff's grievance to Ms. Powell, this is not sufficient to find that Plaintiff exhausted his administrative remedies as to retaliation. <u>See</u> <u>Bainbridge</u>, 2003 WL 21911063, at *7 (concluding that the plaintiff did not exhaust his administrative remedies as to retaliation even though the generic questionnaire contained some questions about retaliation). A questionnaire is not a charge and is not sufficient proof that Plaintiff exhausted his administrative remedies, especially when the ICRC Determination does not show that the ICRC investigated, or that Plaintiff alleged, any such claim.

Finally, Plaintiff, in person or through his attorney, never verified Mr. Erickson's letter or submitted an appropriate amended complaint,[6] even though a cursory review

---

[6] Under I.C.A. § 216.15(1), "[a]ny person claiming to be aggrieved by a discriminatory or unfair practice may, in person or by an attorney, make, sign, and file with the commission a <u>verified</u>, written complaint..."

of the ICRC web site reveals the proper form for filing an amended ICRC complaint.[7]  Thus, the Court concludes that Plaintiff failed to exhaust his administrative remedies as to his retaliation claim.

Similarly, there is no hint of a failure to accommodate claim in Plaintiff's administrative complaint or the ICRC Determination.   When asked in Plaintiff's disability questionnaire whether Defendant failed to accommodate his requests, Plaintiff responded, "Not applicable." Pl. App. 31-32.  Thus, there is no evidence that Plaintiff even alleged at the administrative stage that Defendant failed to accommodate him for his alleged disability.  Furthermore, "a 'failure to accommodate' claim is not reasonably related to and does not reasonably grow out of the investigation of a 'disability discrimination' claim."  Schipper v. Tom Hovland Enters., Inc., No. C 04-3014-MWB, 2005 WL 3480389, at *3 (N.D. Iowa Dec. 20, 2005).  Thus, the Court concludes that Plaintiff

---

[7] See: http://www.state.ia.us/government/crc/docs/Amendedcomplaint. pdf.  Although the Court does not know whether this form existed when Mr. Erickson submitted his letter in 2008, there is no question Plaintiff was required to verify the amended complaint, which he did not do in this case.

failed to exhaust his administrative remedies as to his failure to accommodate claim.

As mentioned, the ICRC Determination concludes that Plaintiff alleged he was terminated because of his disability. The ICRC Determination further details the results of its extensive investigation regarding Plaintiff's claims of the May 1 harassment and the subsequent termination. Thus, the ICRC Determination reveals not only that Plaintiff alleged at the administrative stage that Defendant terminated him because of his disability, but also that the ICRC actually investigated this claim. These facts, contrary to Defendant's argument, are what strongly distinguishes this case from the facts in <u>Bainbridge</u>. In <u>Bainbridge</u>, the ICRC never investigated the claim that was not explicitly alleged in the administrative complaint. In this, case, however, the ICRC thoroughly investigated Plaintiff's claim that he was terminated because of his disability.

Moreover, in reviewing Plaintiff's administrative complaint in which Plaintiff indicates that Defendant terminated him on May 5, the Court would reasonably expect the ICRC to investigate the circumstances surrounding the

termination. Although Plaintiff's allegation of the May 1 harassment (as to Mr. Behr's conduct following the alleged report of grease on the wrapping paper) is separate and distinct from Plaintiff's allegation that he was terminated on May 5 for placing his hand underneath the safety guard, the ICRC could have reasonably suspected that both incidents involved his immediate supervisor about whom Plaintiff complains in his administrative complaint. Thus, the information set forth in the administrative complaint, together with the subsequent investigation and resulting ICRC Determination which expressly states that Plaintiff alleged he was terminated because of his disability, show that Plaintiff exhausted his administrative remedies as to this claim.[8] Although a close call, the Court is persuaded that Plaintiff exhausted his administrative remedies as to his claim that

_____

[8] The Court further recognizes that Plaintiff filed his administrative complaint *pro se*, and given the scope of his alleged disability and IQ of 66, the Court concludes, apparently as did the ICRC, that Plaintiff's administrative complaint is entitled to a very liberal reading. However, the same deference is not required for his alleged amended complaint, which his attorney filed. This letter makes no mention whatsoever of Plaintiff's grievance filed with Ms. Powell, which constitutes the protected conduct surrounding his retaliation claim. The Court can stretch the scope of Plaintiff's administrative complaint only so far.

Defendant terminated him because of his disability.

For the foregoing reasons, the Court concludes that Plaintiff exhausted his administrative remedies as to his claims of harassment and termination based on his disability. Plaintiff failed to exhaust his administrative remedies as to his claims for retaliation and failure to accommodate.

**C.   Plaintiff's   Termination   Claim   under   <u>McDonnell Douglas</u> and the ADA**

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual."  42 U.S.C. § 12112(a).  Discrimination claims under the ADA are analyzed under the burden shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under the <u>McDonnell Douglas</u> framework, a plaintiff must first establish a prima facie case of discrimination.  The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Once the employer meets this burden of production, the plaintiff must show that the legitimate reason proffered by the employer is a pretext for discrimination.  <u>See</u> <u>Young v. Warner-Jenkinson Co., Inc.</u>,

152 F.3d 1018, 1021 (8th Cir. 1998).  The burden of persuasion remains at all times with Plaintiff.  <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000).

To establish a prima facie case under the ADA, Plaintiff must show that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability.  <u>Simpson v. Des Moines Water Works</u>, 425 F.3d 538, 542 (8th Cir. 2005).  For purposes of summary judgment only, Defendant does not challenge that Plaintiff was disabled or qualified to perform the essential functions of his job, with or without reasonable accommodation.  Thus, the Court will focus on the final step of the prima facie analysis - whether Plaintiff suffered an adverse employment action because of his disability.

To prove this final step of the prima facie analysis, Plaintiff must show that he suffered an adverse employment action "under circumstances from which an inference of unlawful discrimination arises." <u>Young</u>, 152 F.3d at 1021-22. An inference of unlawful discrimination "may be raised by

evidence that a plaintiff was replaced by or treated less favorably than similarly situated employees who are not in the plaintiff's protected class." Id. at 1022. However, evidence of disparate treatment is not "the exclusive means by which a plaintiff may establish an inference of discrimination." Id. "Proof necessary to establish a prima facie case in discrimination cases is not inflexible and varies somewhat with the specific facts of each case." Id. (internal quotations omitted). Furthermore, "the threshold of proof necessary to establish a prima facie case is minimal." Id.

In this case, Defendant argues that Plaintiff cannot establish a prima facie case that Defendant terminated him because of his disability because Defendant was not aware of Plaintiff's intellectual disabilities and because the decision makers behind Plaintiff's termination harbored no discriminatory animus toward Plaintiff. The Court is persuaded there exists an issue of material fact as to whether Defendant knew of Plaintiff's intellectual disabilities. Plaintiff's coworker, Mike Finch, testifies in his affidavit that "it was common knowledge throughout the plant, among both workers and management, that [Plaintiff] needed extra help

because of his attention span and his intelligence level."
Finch Aff. ¶ 25, Pl. App. 27-28. Plaintiff also alleges that
Mr. Behr on one occasion referred to Plaintiff as a "retard"
when he informed a coworker he wanted to have Plaintiff fired.
Furthermore, on May 1, 2008, Mr. Behr and Mr. Junck told Ms.
Butzke to "consider the source" after she shut down the
machine because Plaintiff reported that he spotted what
appeared to be grease on the wrapping paper.

Plaintiff also argues that an individual with an IQ of 66
is "open and obvious to an observer." Pl. Resistance Br. 14.
The Court agrees. The Diagnostic and Statistical Manual of
Mental Disorders, 4th edition ("DSM-IV") categorizes an
individual with an IQ of 66 as one suffering from mild mental
retardation. Fuget v. Massanari, 144 F. Supp. 2d 1103, 1111
(S.D. Iowa 2001) (citing DSM-IV, at 40). The DSM-IV describes
mild mental retardation as follows:

> Mild Mental Retardation is roughly
> equivalent to what used to be referred to
> as the educational category of "educable."
> This group constitutes the largest segment
> (about 85%) of those with the disorder. As
> a group, people with this level of Mental
> Retardation typically develop social and
> communication skills during the preschool
> years (ages 0-5 years), have minimal
> impairment in sensorimotor areas, and often

43

> are not distinguishable from children
> without Mental Retardation until a later
> age. By their late teens they can acquire
> academic skills up to approximately the
> sixth-grade level. During their adult
> years, they usually achieve social and
> vocational skills adequate for minimal
> self-support, but may need supervision,
> guidance, and assistance, especially when
> under unusual social or economic stress.

Mims v. Astrue, 701 F. Supp. 2d 892, 909 (S.D. Tex. 2010)

(quoting DSM-IV, at 42-43). With an alleged IQ of 66, the

Court concludes Plaintiff could feasibly display symptoms of

his impairment. Thus, a jury could reasonably conclude

Plaintiff's coworkers and supervisors were aware that

Plaintiff suffered from an intellectual impairment.

As mentioned, Defendant also argues that the decision

makers behind Plaintiff's termination harbored no

discriminatory animus toward Plaintiff; thus, Defendant argues

that it could not have terminated Plaintiff because of his

disability. The Court agrees to the extent that the ultimate

decision makers in this case, Ms. Powell and Mr. Kennedy, did

not harbor a discriminatory animus toward Plaintiff because of

his impairments. There is simply no sufficient evidence in

the summary judgment record that could lead a reasonable jury

to this conclusion. There is no evidence that Ms. Powell or

Mr. Kennedy ever made any comments about, or even referenced, Plaintiff's intellectual impairments.

However, as previously mentioned, those who observed and worked with Plaintiff on a daily basis were arguably aware of Plaintiff's intellectual impairments, and Plaintiff argues that these individuals, including Mr. Behr and Mr. Junck, harbored a discriminatory animus toward him. There is some evidence which, if accepted as true, may support this argument. In addition to the incidents discussed regarding Mr. Behr's "retard" comment as well as the May 1 incident, Mr. Behr and Mr. Junck allegedly informed Plaintiff's coworkers to keep an eye on him because they wanted him fired. Plaintiff also alleged that, on a number of occasions, Mr. Behr took intentional actions to make it difficult for Plaintiff to pack ice cream bars. Additionally, Mr. Behr at times required Plaintiff to work on machines that were too fast for him after Plaintiff requested to move, which resulted in a mess of ice cream bars on the production floor.[9] Finally, Plaintiff

_____

[9] Denying a reasonable accommodation may be relevant to show a discriminatory attitude toward Plaintiff. See Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 834 (8th Cir. 2000). Although the Court concludes Plaintiff failed to
(continued...)

testified about a number of verbal altercations with coworkers, after which Mr. Behr disciplined Plaintiff but not the coworkers. <u>See</u> Rensink Dep. 34-37; Pl. App. 3.

While there is no evidence in the summary judgment record that reveals Ms. Powell or Mr. Kennedy personally harbored any discriminatory animus toward Plaintiff, Plaintiff argues that their decision was entirely influenced by Mr. Behr and Mr. Junck. Ms. Powell, who ultimately decided with Mr. Kennedy to terminate Plaintiff, independently conducted an investigation of the May 5 incident. She testified that she interviewed the individuals who worked on the machine with Plaintiff at the time of the May 5 incident, including Mr. Junck and Ms. Meyer. Ms. Powell admitted that Mr. Junck's input was valued. She

---

[9](...continued)
exhaust his administrative remedies before the ICRC as to his failure to accommodate claim, his argument that Mr. Behr would not accommodate him is nevertheless relevant to the question as to whether Defendant terminated Plaintiff under circumstances from which an inference of unlawful discrimination arises. Employers have a responsibility to engage in an interactive process when employees request accommodations due to an alleged disability. "The failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith." <u>Fjellestad v. Pizza Hut of Am.</u>, 188 F.3d 944, 952 (8th Cir. 1999).

stated:  "... because [Mr. Junck] was the prior Director of Safety ... he's got safety expertise and he would know[,] you know[,] any safety violation lockout/tagout violation, so definitely his input was valued."  Powell Dep. 62; Pl. App. 18.  Plaintiff also argues that Ms. Powell reviewed the Discussion Planners used in Defendant's Progressive Discipline Plan, which Mr. Behr previously completed.  In her investigation, Ms. Powell also talked with Mr. Epling, who informed her that it was physically impossible for Plaintiff to place his hand underneath the safety guard without injuring himself.  Nevertheless, she determined that Plaintiff placed his hand underneath the safety guard and committed a serious safety violation.  Thus, the Court concludes she must have at least partially relied on Mr. Junck's and Ms. Meyer's account that they witnessed Plaintiff place his hand underneath the machine.[10]

Additionally, Ms. Powell reviewed Mr. Lovell's report, in which he recounted the meeting following the May 5 incident. In the report, Mr. Lovell stated that Plaintiff admitted that

---

[10]  Ms. Meyer is one of the individuals who Plaintiff alleges was aware that Mr. Junck and Mr. Behr wanted to fire him.

he committed a serious safety violation.  Def. App. 257.
However, Mr. Epling and Plaintiff both denied that Plaintiff
ever admitted as such.

The Court is persuaded after reviewing the scope of Ms.
Powell's investigation that she conducted the investigation in
good faith; however, a jury could reasonably find that her
decision was unreasonable and wrong, and that Plaintiff never
placed his hand underneath the guard and never committed a
safety violation.  In the first instance, in March 2007,
Plaintiff placed his hand underneath the safety guard and
suffered an injury as a result.  There was no doubt that he
committed a safety violation at that time, and he admitted as
much.  In the May 5, 2008, incident, Plaintiff was not cut or
injured in any way, and it was highly unlikely he would have
escaped serious injury had his hand been underneath the safety
guard.  Thus, a jury could reasonably conclude there was a
factual issue that should have precluded Ms. Powell from
finding that Plaintiff's hand was underneath the guard, thus
committing a safety violation necessary to terminate him.

Although certainly a close call based on the summary
judgment record, a jury could reasonably conclude that Ms.

Powell's decision was sufficiently influenced by those who harbored a discriminatory animus toward Plaintiff, including Mr. Junck, who she interviewed, and Mr. Behr, who previously filed disciplinary reports against Plaintiff. Plaintiff alleges Mr. Junck and Mr. Behr both wanted to find a reason to fire him, and a jury could reasonably conclude the information Ms. Powell received supporting Plaintiff's termination, especially from Mr. Junck and Mr. Behr, was not without bias. This Court therefore cannot grant Defendant summary judgment under these circumstances, where those who harbored a discriminatory animus toward Plaintiff may have reasonably influenced and tainted Ms. Powell's and Mr. Kennedy's decision. See Dedmon v. Staley, 315 F.3d 948, 949 n.2 (8th Cir. 2003) ("... an employer can be liable, under certain circumstances, where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee."); see also Lanahan v. S. Nev. Health Dist., No. 2:06CV-01176-LRH-LRL, 2009 WL 395794 (D. Nev. Feb. 17, 2009) (stating:

> [T]he decision makers here, while unbiased themselves, took into account factors allegedly tainted by sexism in making an adverse employment decision. The court, of

course, recognizes that the incident
leading to Lanahan's termination was
investigated and acted upon by unbiased
decision makers. However, the court cannot
ignore evidence that the decision makers
also implicitly relied on Boyd's
disciplinary actions in deciding to
terminate Lanahan.

Id. at *7 (citing Dominquez-Curry v. Nev. Transp. Dep't, 424
F.3d 1027, 1039-40 (9th Cir. 2005) ("Where ... the person who
exhibited discriminatory animus influenced or participated in
the decisionmaking process, a reasonable fact finder could
conclude that the animus affected the employment decision.").
Thus, the Court is persuaded Plaintiff has set forth
sufficient evidence to establish a prima facie case that
Defendant terminated him because of his alleged disability.

Once the plaintiff has established his prima facie case,
the burden shifts to the employer to articulate a legitimate,
nondiscriminatory reason for the adverse employment action.
Defendant can meet its burden at this stage of the McDonnell
Douglas analysis by "introduc[ing] evidence which, taken as
true, would permit the conclusion that there was a
nondiscriminatory reason for the adverse action." St. Mary's
Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). This burden is
"one of production, not persuasion; it 'can involve no

credibility assessment.'" <u>Reeves</u>, 530 U.S. at 142 (quoting <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 509).

In this case, Defendant claims that it terminated Plaintiff because he committed a serious safety violation on May 5, 2008, after he committed a similar violation in March 2007. Defendant terminated Plaintiff according to the terms set forth in Defendant's Progressive Discipline Plan. This reason is legitimate and nondiscriminatory on its face. Thus, Defendant has produced sufficient evidence to meet its burden.

When the employer articulates a legitimate, nondiscriminatory reason for its adverse employment action, the burden returns to the plaintiff to prove that the employer's proffered reasons are a pretext for discrimination. Thus, a plaintiff must produce evidence that the employer's reasons are false and that there is a reasonable inference of unlawful discrimination. <u>Young</u>, 152 F.3d at 1023. "[A]n inference of discrimination may sometimes arise without additional evidence where the overall strength of the prima facie case and the evidence of pretext suffices to show intentional discrimination." <u>Id.</u>; <u>see also</u> <u>Reeves</u>, 530 U.S. at 148 (a plaintiff's prima facie case, combined with

sufficient evidence to find that the employer's asserted reason for adverse employment action is false, <u>may</u> permit a trier of fact to conclude that the employer unlawfully discriminated); <u>see also</u> <u>Wallace v. DTG Operations, Inc.</u>, 442 F.3d 1112, 1120 n.2 (8th Cir. 2006) ("As the Court made clear in <u>Reeves</u>, a strong prima facie case coupled with proof of pretext may suffice to create a triable question of fact.").

In this case, Plaintiff has produced evidence, based on Employee Committee representative Mr. Epling's findings, that it was physically impossible for Plaintiff to place his hand underneath the safety guard (thus committing a serious safety violation) without injuring himself. Plaintiff further produced evidence that Mr. Finch, who also witnessed the May 5 incident, stated that Plaintiff did not place his hand underneath the safety guard. Thus, Plaintiff argues that Defendant's conclusion to the contrary was wrong. Plaintiff has also produced evidence which could lead a reasonable jury to conclude that his supervisors, Mr. Behr and Mr. Junck, harbored a discriminatory animus toward him and that statements from these individuals influenced and tainted the decision to terminate him. Thus, the Court is persuaded

Plaintiff has produced evidence that, when viewed in the light most favorable to Plaintiff, raises a genuine issue of material fact as to whether Defendant's proffered reasons for terminating Plaintiff are a pretext for disability discrimination. With the high number of other factual issues surrounding Plaintiff's disability discrimination claims in dispute, and remembering that summary judgment in employment discrimination actions should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party,"[11] a jury trial in this case is appropriate. Therefore, Defendant's motion for summary judgment as to Plaintiff's termination claim will be denied.

### D. Plaintiff's Harassment/Hostile Work Environment Claim

Employees who are subjected to a hostile work environment may bring such a claim pursuant to the ADA. Shaver v. Indep. Stave Co., 350 F.3d 716, 719 (8th Cir. 2003).[12] To be

---

[11] Hindman, 145 F.3d at 990.

[12] "We have suggested in dicta that it might be possible to bring a claim for a hostile work environment under the ADA... Today... we join the other circuits that have decided the issue by holding that such claims are in fact actionable."

entitled to relief, Plaintiff must show the following: (1) he is disabled; (2) he was subjected to unwelcome harassment; (3) the harassment resulted from his disabled status; and (4) "the harassment was severe enough to affect the terms, conditions, or privileges of his employment." Id. at 720.

In this case, the Court will assume that Plaintiff can meet the first three elements of his hostile work environment claim. The Court will focus its attention on whether the harassment was severe enough to affect the terms, conditions, or privileges of Plaintiff's employment. In order to be actionable under this step of the analysis,

> harassment must be both subjectively hostile or abusive to the victim and severe and pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive... On the other hand, we have repeatedly emphasized that anti-discrimination laws do not create a general civility code. Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law.

Id. at 721 (internal citations and quotations omitted). Additionally, determining whether a work environment is hostile or abusive depends on all of the circumstances,

including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

The objective submissibility of hostile environment claims within the Eighth Circuit is extraordinarily restrictive. See, e.g., Jackson v. Flint Ink N. Am. Corp., 382 F.3d 869, 870 (8th Cir. 2004) (finding an African-American employee, whose name was written on the shower wall with an arrow pointing to a picture of a burning cross and Ku Klux Klan sign, could submit his claim to a jury, although the claim was merely "on the cusp of submissibility"). Additionally, in Shaver, the Eighth Circuit found that the plaintiff, who had a plate implanted in his skull, had no objectively actionable claim for hostile work environment even though his supervisors and coworkers routinely referred to him as "platehead" for a period of two years. The court determined the level of harassment did not rise to the same level as that in previous cases where the court had granted relief. The court stated:

For example, in <u>Smith v. St. Louis Univ.</u>,
109 F.3d 1261, 1264-65 (8th Cir. 1997), we
allowed a suit to continue where the
plaintiff had been subject to verbal abuse,
but in that case there was evidence that a
supervisor had repeatedly singled the
plaintiff out and that she had been
hospitalized twice as a result of the
psychological trauma that she suffered.
Showing some tangible psychological
condition is not necessary to make out a
hostile work environment claim, but it may
be taken into account. <u>Harris</u>, 510 U.S. at
22-23, 114 S. Ct. 367. While Mr. Shaver
was upset about the harassment at work, it
was not so severe as to result in any
psychological treatment. In [<u>Reedy v.
Quebecor Printing Eagle, Inc.</u>, 333 F.3d
906, 909-10 (8th Cir. 2003)], we upheld a
hostile work environment claim based on
harassing words, but the words at issue
were death threats directed specifically at
the plaintiff over a sustained period of
time. In contrast, there is no allegation
or evidence in this case to suggest that
any of the harassment of Mr. Shaver was
explicitly or implicitly threatening. Nor
does this case involve harassing conduct of
a physical nature as was found actionable
in many of the cases that Mr. Shaver cites.
<u>See</u>, <u>e.g.</u>, <u>Breeding v. Arthur J. Gallagher
& Co.</u>, 164 F.3d 1151, 1159 (8th Cir. 1999);
<u>Rorie v. United Parcel Serv., Inc.</u>, 151
F.3d 757, 761-62 (8th Cir. 1998).

<u>Shaver</u>, 350 F.3d 716, 721-22.

In this case, Plaintiff's allegations of harassment are
set out on pages 19-20 of this order. Plaintiff argues that
these incidents of harassment constituted a pattern and

56

practice of the ongoing discrimination against him.  Plaintiff further argues that, while not all of the harassment against him was facially discriminatory, these incidents should nevertheless be considered.  He cites to the case of Carter v. Chrysler Corp., 173 F.3d 693 (8th Cir. 1999), to support his argument.  The Court agrees that "all instances of harassment need not be stamped with signs of overt discrimination to be relevant ... if they are part of a course of conduct which is tied to evidence of discriminatory animus."  Id. at 701.  However, the level of harassment in Carter was far more severe, disturbing, and pervasive than the harassment at issue in this case.

In Carter, an African-American woman worked on the production line at a Chrysler automobile plant and was subjected to a series of abusive acts for two years.  The court summarized the level of harassment as follows:

> Carter has produced evidence that she experienced a host of indignities over the course of some two years.  She regularly suffered verbal abuse interlaced with sexual and racial epithets.  Rude sexual gestures were frequently made towards her, sexual insults were written on the walls of the company restroom, and acts of vandalism occurred in her work area.  A picture of a naked man, dead animals, threatening notes,

> foul-smelling material, and debris were directed at her area.

<u>Id.</u> at 702.[13]

Thus, the Eighth Circuit, as set out in the cases cited above, has made quite clear that the level of harassment must be far more severe and pervasive than the alleged harassment in this case to be objectively actionable. While Mr. Behr and Mr. Junck's comments and actions were certainly offensive, they were not physically threatening or particularly humiliating. Moreover, a single and discrete incident of calling Plaintiff a "retard" <u>might</u> show discriminatory animus toward Plaintiff, but in terms of his hostile work environment claim, does not objectively rise to the level of severity or pervasiveness required to be actionable.

Mr. Behr's and Mr. Junck's conduct toward Plaintiff, in this Court's opinion, certainly amounted to inexcusable harassment. Nevertheless, under the precedent set forth in the Eighth Circuit and for the reasons stated herein, the

---

[13] For a far more detailed and disturbing recount of the employee's harassment in <u>Carter</u>, <u>see</u> <u>id.</u> at 696-97.

Court concludes as a matter of law[14] that Plaintiff cannot show the harassment reached a level of severity or pervasiveness that it objectively affected the terms, conditions, or privileges of his employment.[15]

**E. Plaintiff's claims under the FMLA**

There are two types of claims under the FMLA: (1) an "interference" claim in which the employee alleges he was denied substantive rights under the FMLA; and (2) a "retaliation" claim in which the employee alleges the employer discriminated against him for exercising his rights under the FMLA. 29 U.S.C. § 2615(a)(1)-(2); <u>Phillips v. Mathews</u>, 547 F.3d 905, 909 (8th Cir. 2008). Moreover, "an employee need not invoke the FMLA by name in order to put an employer on notice that the Act may have relevance to the employee's absence from work." <u>Thorson v. Gemini, Inc.</u>, 205 F.3d 370, 381 (8th Cir. 2000); <u>see also</u> 29 C.F.R. § 825.303(b) ("The

---

[14] "The question of whether an environment is sufficiently hostile to be actionable is a legal question, and, like any legal question, is a matter for the court to decide." <u>Jackson</u>, 382 F.3d at 869.

[15] The Court, therefore, need not discuss the subjective severity of the harassment; although, at the time of this conduct, it appeared Plaintiff stated only that he felt "nervous at times." Rensink Dep. 115-17; Def. App. 112-14.

employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed."). "Under the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." Thorson, 205 F.3d at 381 (quoting Browning v. Liberty Mut. Ins. Co., 178 F.3d 1043, 1049 (8th Cir. 1999)).

Plaintiff alleges two claims pursuant to FMLA: (1) Defendant interfered with his FMLA leave; and (2) Defendant terminated him in retaliation for taking FMLA leave. As to his interference claim, Plaintiff argues that Defendant interfered with his FMLA leave by counting his November 2007 absence as unexcused. Plaintiff claims when he requested that Mr. Behr and Ms. Powell mark the absence as FMLA, they refused. Defendant does not appear to argue for the purposes of summary judgment that, if true, Defendant may have technically violated the FMLA as to Plaintiff's interference claim regarding his November 2007 absence. Defendant argues, however, that this Court should grant its summary judgment motion because Plaintiff suffered no monetary loss as a result of this technical violation. After reviewing the record and

relevant law, the Court agrees.

An employer who violates the FMLA is liable to the employee for damages, including "wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation" or "any actual monetary losses sustained by the employee as a direct result of the violation" up to a sum equal to twelve weeks of wages or salary, plus possible liquidated damages up to the amount of compensatory damages. 29 U.S.C. § 2617(a)(1)(A)(i)-(iii). Additionally, the eligible employee may be entitled to equitable relief if "appropriate," including employment, reinstatement, and promotion. 29 U.S.C. § 2617(a)(1)(B). In Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 739-40 (2003), the Supreme Court explained that "the cause of action under the FMLA is a restricted one: The damages recoverable are strictly defined and measured by actual monetary losses." Id.; see also Rodgers v. City of Des Moines, 435 F.3d 904, 909 (8th Cir. 2006) (citing Hibbs). Prohibited damages under the FMLA include emotional distress, nominal, consequential, and punitive damages. See Rodgers, 435 F.3d at 909; see also Farrell v. Tri-County Metro. Transp. Dist. of Or., 530 F.3d

1023, 1025 (9th Cir. 2008); <u>Brumbalough v. Camelot Care Ctrs.,</u>
<u>Inc.</u>, 427 F.3d 996, 1007 (6th Cir. 2005); <u>Graham v. State</u>
<u>Farm. Mut. Ins. Co.</u>, 193 F.3d 1274, 1284 (11th Cir. 1999); and
<u>Andrews v. CSX Transp., Inc.</u>, No. 3:06-cv-704-J-32HTS, 2009 WL
5176462, at *2 n.6 (M.D. Fla. Dec. 22, 2009).

Moreover, the FMLA "'provides no relief unless the
employee has been prejudiced by the violation.'" <u>Rodgers</u>, 435
F.3d at 909 (quoting <u>Ragsdale v. Wolverine World Wide, Inc.</u>,
535 U.S. 81, 89 (2002)). "'The remedy is tailored to the harm
suffered.'" <u>Id.</u>

In this case, Plaintiff has presented no evidence
rebutting Defendant's argument that Plaintiff suffered no
monetary loss as a result of his November 2007 absence
because, Defendant argues, he would not have been paid for the
absence either way. In her deposition, Ms. Powell testified
that Plaintiff was not disciplined in any way other than that
his absence was marked as the sixth "occurrence." While an
"occurrence" is arguably a form of discipline, Plaintiff has
presented no evidence that the "occurrence" caused him any
monetary loss. He was not demoted or moved to a different
position. He received no fine, reduction in pay, or lost any

seniority.  Powell Dep. 53; Def. App. 135.  Plaintiff, however, argues that Ms. Powell considered this sixth "occurrence" when investigating the May 5 incident and whether Plaintiff should be terminated.  There is no evidence, however, that Ms. Powell ever considered Plaintiff's unexcused absences, or if she did, that Plaintiff's sixth occurrence had any greater of a determinative influence on her decision than if he had only five occurrences.  Thus, the Court concludes Plaintiff suffered no prejudice or loss as a result of his November 2007 absence which would permit him to recover monetary damages under the FMLA.  The Court further concludes that no equitable relief would be appropriate in this case given the minimal consequences of this potential violation.

Plaintiff also alleges that Defendant terminated him in retaliation for taking FMLA leave.  Plaintiff took FMLA leave from April 21-23, 2008.  He alleges the temporal proximity of his leave to his termination is sufficient to present an issue of fact as to whether Defendant terminated him in retaliation for his FMLA leave.

Because Plaintiff has provided no direct evidence of retaliation, the Court will analyze his claims under the

burden shifting standards set forth in <u>McDonnell Douglas</u>.[16]
To establish a prima facie case for retaliation under the
FMLA, Plaintiff must show: (1) he exercised his rights
afforded by the FMLA; (2) he suffered an adverse employment
action; and (3) there was a causal connection between his
exercise of rights and the adverse employment action.
<u>McBurney v. Stew Hansen's Dodge City, Inc.</u>, 398 F.3d 998, 1002
(8th Cir. 2005).

Assuming Plaintiff could establish the first two elements
of his prima facie case, Plaintiff's strongest argument for
proving a causal connection between the protected conduct and
the adverse employment action is the temporal proximity
between the two events, and this argument is weak. The
protected conduct at issue stemmed from his FMLA leave from
April 21-23, 2008, nearly two weeks prior to the May 5
incident and a month prior to his May 22 termination.
"'Generally, more than a temporal connection between the
protected conduct and the adverse employment action is

---

[16] <u>McBurney v. Stew Hansen's Dodge City, Inc.</u>, 398 F.3d
998, 1002 (8th Cir. 2005) ("An employee can prove FMLA
retaliation circumstantially, using a variant of the burden
shifting test established in [<u>McDonnell Douglas</u>].").

required to present a genuine factual issue on retaliation.'" <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827, 832 (8th Cir. 2002) (quoting <u>Kiel v. Select Artificials, Inc.</u>, 169 F.3d 1131, 1136 (8th Cir. 1999)).

Even if temporal proximity in this case is sufficient to meet the minimum burden of establishing his prima facie case of FMLA retaliation, Plaintiff presents no evidence that his termination was connected in any way to his FMLA leave. To the contrary, during Plaintiff's employment with Defendant, he took FMLA leave on numerous occasions in 2007 and 2008 and was denied leave only once. There is no evidence in the record that Defendant's decision to terminate him had any causal relationship with his use of FMLA leave. There is no evidence of any discriminatory remarks or complaints about Plaintiff's migraine headaches or his use of FMLA leave. Thus, even assuming Plaintiff could establish his prima facie case (the Court is persuaded he could not), Plaintiff produced no evidence that could satisfy the final step of the <u>McDonnell Douglas</u> test, which requires Plaintiff to prove that Defendant's proffered reasons for terminating him are a pretext for retaliation because of his FMLA leave. While

Plaintiff has offered evidence that creates a genuine issue of material fact as to whether Defendant's proffered reasons for Plaintiff's termination are pretextual, Plaintiff has offered no evidence that could lead a jury to reasonably conclude that Defendant retaliated against Plaintiff because of his migraine headaches or FMLA leave.[17]

## IV. CONCLUSION

For the reasons stated herein, the Court concludes as follows:

**(1)** Plaintiff did not exhaust his administrative remedies as to his claims for failure to accommodate and retaliation. Thus, Defendant's motion for summary judgment as to these claims is **granted**.

**(2)** Plaintiff has demonstrated a genuine issue of material fact as to whether Defendant terminated him because

---

[17] <u>See also</u> <u>Taylor v. White</u>, 321 F.3d 710, 715 (8th Cir. 2003) ("[A]lthough [Plaintiff] does not have to provide direct proof that genuine issues of fact exist for trial, the facts and circumstances that [Plaintiff] relies upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion. In essence, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.") (internal citations and quotations omitted).

of his disability. Thus, Defendant's motion for summary judgment as to this claim is **denied.**

**(3)** Plaintiff cannot demonstrate a genuine issue of material fact that would entitle him to relief as a matter of law as to his harassment/hostile work environment claim. Thus, Defendant's motion for summary judgment as to this claim is **granted.**

**(4)** Plaintiff cannot demonstrate a genuine issue of material fact that would entitle him to relief as a matter of law as to his FMLA claims. Thus, Defendant's motion for summary judgment as to these claims is **granted.**

**IT IS THEREFORE HEREBY ORDERED** that Defendant's Motion for Summary Judgment, Docket No. 16, is **granted in part/denied in part**.

**IT IS SO ORDERED** this 15th day of September, 2010.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa